No. 25-_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

IN RE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY,

*Petitioner.*

————————————

On Petition for Writ of Mandamus
to the United States District Court
for the Southern District of Florida
Case No. 9:23-cr-80101-AMC

## PETITION FOR WRIT OF MANDAMUS

David Buckner
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables, FL 33134
(305) 964-8003

Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
scott.wilkens@knightcolumbia.org

*Counsel for Petitioner*

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Petitioner Knight First Amendment Institute at Columbia University certifies that the following have an interest in the outcome of this mandamus petition.

1. Abdo, Alex

2. American Oversight

3. Buckner & Miles, P.A.

4. Buckner, David

5. Cannon, Aileen

6. De Oliveira, Carlos

7. Diakun, Anna

8. E & W Law

9. Gelber Schachter & Greenberg, P.A.

10. Haddix, Elizabeth

11. Irving, John

12. Jaffer, Jameel

13. Kim, Noah

14. Klugh Jr., Richard

15. Klugh Wilson LLC

16. Knight First Amendment Institute at Columbia University

17. L.D. Murrell, P.A.

18. Llanes, Barbara

19. Murrell Jr., Larry

20. Nauta, Waltine

21. O'Byrne, Haden

22. Porter, Michael

23. Schachter, Adam

24. Stark, Lorree

25. Trump, Donald

26. Wilkens, Scott

27. Wilson, Jenny

The Knight First Amendment Institute at Columbia University further certifies that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

/s/ Scott Wilkens
Scott Wilkens

**Table of Contents**

Certificate of Interested Persons and Corporate Disclosure Statement.................... 1

Table of Authorities ............................................................................ iii

Petition for Writ of Mandamus .............................................................. 1

I.    The Relief Sought ................................................................... 2

II.   The Issue Presented................................................................ 3

III.  The Facts Necessary to Understand the Issues Presented......................... 3

    A.    The Special Counsel's investigation and the indictment of then-former President Trump under the Espionage Act ................ 3

    B.    President Trump's re-election and the dismissal of the case against him........................................................................ 5

    C.    The Special Counsel's submission of his report to the Attorney General ................................................................ 6

    D.    The January 21 Injunction .......................................................... 7

    E.    The dismissal of the case against Nauta and De Oliveira.............. 10

    F.    The Knight Institute's FOIA request ............................................ 11

    G.    The Knight Institute's motion to intervene................................... 12

IV.  The Reasons Why the Writ Should Issue ............................................. 13

    A.    Legal standard governing issuance of the writ ............................. 13

    B.    All three requisites for issuance of the writ are satisfied here....... 14

        1.    The Knight Institute has no other adequate means to obtain relief because an interlocutory appeal is not available. ............................................................. 14

2. The Knight Institute's entitlement to the writ is clear and indisputable....................................................15

3. Issuance of the writ is appropriate under the circumstances. ...................................................20

    a. The district court's delay is manifestly unreasonable because it has compromised important interests raised in the intervention motion. ...................................................20

    b. The strength of the substantive claims made in the motion underscores the need for the writ............21

    c. The Petition raises "special circumstances" that further reinforce the need for the writ. ......................30

Conclusion........................................................................31

Certificate of Compliance ......................................................33

# Table of Authorities

**Cases**

*American Oversight v. U.S. Dep't of Justice*, 779 F. Supp. 3d 40 (S.D.N.Y. April 2025) ................................................................. 11

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ............................... 29

*Callahan v. United Network for Organ Sharing*, 17 F.4th 1356 (11th Cir. 2021) ............................................................................ 25

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004) ............................... 13, 14

*Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200 (9th Cir. 2024) ................................................................................ 22

*Cohens v. Virginia*, 19 U.S. 264 (1821) ............................................ 15

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ................................ 28

*Comm'r, Ala. Dep't of Corr. v. Advance Local Media LLC*, 918 F.3d 1161 (11th Cir. 2019) ................................................................ 26

*Courthouse News Serv. v. Planet*, 947 F.3d 581 (9th Cir. 2020) ............ 17

*Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021) ........... 17

*Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014) ..................... 17, 18, 19

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ................................................................... 21, 22, 24

*In re A.H.*, 999 F.3d 98, 106 (2d Cir. 2021) ................................ 15, 16

*In re Asbestos Sch. Litig.*, 46 F.3d 1284 (3d Cir. 1994) ..................... 15

*In re Associated Press*, 162 F.3d 503 (7th Cir. 1998) ........................ 17

*In re Bennett*, 136 F.3d 1279 (11th Cir. 1998) ................................ 13

*In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001) ............................. 25

*In re Daker*, 685 F. App'x 790 (11th Cir. 2017) ...............................................13, 16

*In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011)...........................22

*In re North*, 16 F.3d 1234 (D.C. Cir. 1994) ......................................................30

*In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559 (11th Cir. 1989)................................................22

*Lohnn v. Int'l Bus. Mach. Corp.*, No. 21-CV-6379 (LJL), 2022 WL 36420 (S.D.N.Y. Jan. 4, 2022) ...............................................................19

*Lugosch v. Pyramid Co.*, 435 F.3d 110 (2d Cir. 2006) ...................................17, 18

*Madden v. Myers*, 102 F.3d 74 (3d Cir. 1996) .......................................................16

*N.Y. Times Co. v. U.S. Dep't of Justice*, 25-cv-562, 2025 WL 2549435 (S.D.N.Y. Sept. 4, 2025) ..............................................................11, 29

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) .........................................................31

*New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237 (11th Cir. 2024)................16

*Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983).......................................22, 26

*Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298 (5th Cir. 1984) .................28

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) ........................................25

*Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501 (1984).......................21

*Press-Enterprise Co. v. Superior Ct. of Cal.*, 478 U.S. 1 (1986). .....................21, 23

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ..............................21

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943)......................................13, 30

*Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256 (11th Cir. 2021)..........................13

*Romero v. Drummond Co.*, 480 F.3d 1234 (11th Cir. 2007) .............................25, 26

*Rothman v. Snyder*, Civil No. 20-3290 PJM, 2020 WL 7395488 (D. Md. Dec. 17, 2020) ......................................................................19

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ........................30

*U.S. Dep't of Def. v. Fed. Labor Rel. Auth.*, 510 U.S. 487 (1994)........................31

*United States v. Hasting*, 461 U.S. 499 (1983) ......................................................29

*United States v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005) ..................22, 23

*United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993) ........................................15

*Weinberger v. Romer-Barcelo*, 456 U.S. 305 (1982)........................................29, 30

*Will v. Calvert Fire Ins. Co.*, 437 U.S. 655 (1978) ................................................13

**Statutes**

28 C.F.R. § 16 ..........................................................................................................20

28 C.F.R. § 600 ..........................................................................................................6

5 U.S.C. § 552 ................................................................................................1, 19, 20

**Other Authorities**

Alan Feuer, *Four Takeaways From the Special Counsel's Report on the Trump Election Case*, N.Y. Times (Jan. 14, 2025), https://perma.cc/PT99-YFZL ...............................................................................8

*DOJ's Response to Knight Institute's Administrative Appeal (6/20/2025)*,  https://perma.cc/27MM-2CZG .....................................................11

*Letter from Attorney General Merrick Garland to Chairman Charles Grassley, Chairman Jim Jordan, Ranking Member Dick Durbin, and Ranking Member Jamie Raskin* (Jan. 8, 2025), https://perma.cc/QKT8-PRRC ...............................................................................8

*Letter from Special Counsel Jack Smith, to Att'y Gen. Merrick Garland, Re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8* (Jan. 7, 2025), https://perma.cc/8SWU-PKL7 ....................................6, 7

Office of the Attorney Gen., Order No. 5559-2022, Appointment of
John L. Smith as Special Counsel ¶ (c) (Nov. 18, 2022), *available
at* https://perma.cc/H6GX-8N7A ........................................................................3

Sam Lebovic, *State of Silence: The Espionage Act and the Rise of
America's Secrecy Regime* (Basic Books, 2023) ...............................................24

Special Counsel David C. Weiss, *Report on the Investigation Into the
Criminal Conduct of Robert Hunter Biden* (Jan. 10, 2025),
https://perma.cc/8LHM-9P2N........................................................................7

Special Counsel Jack Smith, *Final Report on the Special Counsel's
Investigations and Prosecutions–Volume One: The Election Case–
Report on Efforts to Interfere With the Lawful Transfer of Power
Following the 2020 Presidential Election or the Certification of
the Electoral College Vote Held on January 6, 2021* (Jan. 7, 2025),
https://perma.cc/8SWU-PKL7 .......................................................................9

Special Counsel John H. Durham, *Report on Matters Related to
Intelligence Activities and Investigations Arising Out of the 2016
Presidential Campaigns* (May 12, 2023), https://perma.cc/2WW9-
6WDD ..............................................................................................................7

Special Counsel Robert K. Hur, *Report of the Special Counsel on the
Investigation Into Unauthorized Removal, Retention, and
Disclosure of Classified Documents Discovered at Locations
Including the Penn Biden Center and the Delaware Private
Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024),
https://perma.cc/Q6QS-HPSG .......................................................................7

Special Counsel Robert S. Mueller III, *Report On The Investigation
Into Russian Interference In The 2016 Presidential Election* (Mar.
2019), https://perma.cc/42LF-NLXC...............................................................7

Wright & Miller, Federal Practice & Procedure (3d ed.).......................................13

## Petition for Writ of Mandamus

Petitioner Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute") respectfully petitions this Court for a writ of mandamus compelling the court below to rule on a motion to intervene that the Institute filed on February 24, 2025, more than six months ago, and that has been fully briefed since March 31. The motion asserted a common law and First Amendment right of access to Volume II of a report written by Justice Department ("DOJ") Special Counsel Jack Smith, which compiles and evaluates evidence that then-former President Donald J. Trump and his associates Walt Nauta and Carlos De Oliveira mishandled classified documents after Trump left office in January 2021. The motion also challenged the district court's grounds for keeping in place an injunction it entered on January 21, 2025 (the "January 21 Injunction") barring DOJ from releasing Volume II to anyone outside the Department. The Knight Institute has standing to seek the latter relief because the January 21 Injunction effectively extinguishes the Institute's statutory right to obtain Volume II from the Justice Department under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

Mandamus relief is warranted here because the district court's six-month delay in ruling on the Institute's motion to intervene is manifestly unreasonable. It is well-established that the common law and constitutional right of access to judicial records encompasses a right to *prompt* adjudication of access motions, in recognition

of the fact that the postponement of disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression. The district court's failure to address the Institute's access claims has already compromised the Institute's rights, and each passing day constitutes an additional abridgement. The district court's failure to address the Institute's challenge to the January 21 Injunction similarly thwarts the Institute's *statutory* right of timely access to government records under FOIA. The injury caused by the district court's inaction is compounded by the extraordinary significance to the public of the record being suppressed, a record whose disclosure would shed light both on the scope and integrity of the Special Counsel's investigation and on the character and actions of the nation's highest official.

For all of these reasons, the Knight Institute respectfully petitions this Court for a writ of mandamus directing the district court to fully resolve the motion to intervene—including the substantive claims raised therein—without further delay.

## I.    The Relief Sought

The Knight Institute respectfully petitions this Court for a writ of mandamus directing the district court to fully resolve the motion to intervene—including the substantive claims raised therein—without further delay.[1]

---

[1] If the district court denies the Institute's motion to intervene, the Institute intends to file a notice of appeal promptly and to ask this Court to expedite the appeal.

## II. The Issue Presented

Whether the district court's failure to adjudicate the Knight Institute's motion to intervene, which was filed more than six months ago and has been fully briefed since March 31, 2025, warrants this Court's issuance of a writ of mandamus compelling the district court to decide the motion in light of the constitutional, common law, and statutory rights asserted and the significance to the public of the document at issue.

## III. The Facts Necessary to Understand the Issues Presented

### A. The Special Counsel's investigation and the indictment of then-former President Trump under the Espionage Act

On March 30, 2022, the FBI opened a criminal investigation into then-former President Donald Trump's retention of classified documents at the Mar-a-Lago Club, and a federal grand jury was convened shortly thereafter. A077. On November 18, 2022, Attorney General Merrick Garland appointed Jack Smith as Special Counsel to oversee the ongoing DOJ investigations into President Trump's alleged interference with the lawful transfer of power following the 2020 presidential election ("Election Interference Case") and his alleged unlawful retention of classified documents after leaving office ("Classified Documents Case").[2]

---

[2] Office of the Attorney Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel ¶ (c) (Nov. 18, 2022), *available at* https://perma.cc/H6GX-8N7A.

The Special Counsel filed an indictment in the Classified Documents Case on June 8, 2023, charging President Trump with thirty-seven felony counts, including thirty-one violations of the Espionage Act. A075. The indictment alleged that, upon leaving the White House on January 20, 2021, President Trump instructed aides to transport boxes containing classified documents to Mar-a-Lago; that the classified documents included highly sensitive military and intelligence secrets; that the president stored these boxes carelessly in various locations that were potentially accessible to thousands of members and guests; that he showed classified documents to non-security-cleared members of his club staff and others; that he failed to return classified documents to the government after being served with a subpoena requiring their immediate return; and that he made false statements and conspired with others to "obstruct the FBI and grand jury investigations and conceal his continued retention of classified documents." A076–77.

The June 2023 indictment also charged one of Trump's associates, Walt Nauta, as a co-conspirator, alleging that he had conspired with Trump to conceal the presence of documents. A077. On July 27, 2023, a superseding indictment added a second Trump associate, Carlos De Oliveira, as a co-conspirator. A124. The superseding indictment also added additional charges against Trump and Nauta. *Id.*

**B.    President Trump's re-election and the dismissal of the case against him**

On July 15, 2024, the district court presiding over the Classified Documents Case dismissed the superseding indictment in its entirety on the grounds that Smith's appointment as Special Counsel violated the Appointments Clause. A067 (Dkt. entry 672). The Special Counsel filed a notice of appeal on July 17, 2024. *Id.* (Dkt. entry 673). Following President Trump's re-election, however, the Special Counsel moved to dismiss the appeal as to Trump in light of the Justice Department's longstanding position "that the United States Constitution forbids the federal indictment and subsequent criminal prosecution of a sitting President."[3] This Court granted the motion to dismiss on November 26, 2024. A275 (Dkt. entry 81). The Special Counsel subsequently withdrew from the Classified Documents Case and transferred it to the U.S. Attorney for the Southern District of Florida. *Id.* (Dkt. entry 84).[4]

---

[3] *See* A278, A290 (incorporating the reasoning given in Gov't's Mot. to Dismiss, *United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C. Nov. 25, 2024), ECF No. 281).

[4] The Special Counsel also moved to dismiss the Election Interference Case, and the U.S. District Court for the District of Columbia granted that motion on November 25, 2024. *United States v. Trump*, Criminal Action No. 23-257, ECF No. 283 (D.D.C. Nov. 25, 2024) (order dismissing superseding indictment).

**C.    The Special Counsel's submission of his report to the Attorney General**

On January 7, 2025, the Special Counsel submitted his final report to Attorney General Garland, as DOJ regulations required him to do.[5] The report comprised two volumes—the first addressing the Election Interference Case and the second addressing the Classified Documents Case.

In a cover letter accompanying the report, Smith expressed his understanding that the Attorney General was considering releasing the report to the public "consistent with applicable legal restrictions."[6] Smith cited regulations providing that the Attorney General may "determine that public release of [a Special Counsel's final report] would be in the public interest, to the extent that release would comply with applicable legal restrictions." 28 C.F.R. § 600.9(c). (Since 1999, when the Special Counsel regulations went into effect, *see* 28 C.F.R. Part 600, DOJ has publicly released every final report of a Special Counsel, with the sole exception of Volume II of Special Counsel Smith's report.[7]) Smith assured the Attorney General

---

[5] *Letter from Special Counsel Jack Smith, to Att'y Gen. Merrick Garland, Re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8* (Jan. 7, 2025), https://perma.cc/8SWU-PKL7. The Special Counsel regulations provide that, "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c).

[6] *Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7.

[7] Special Counsel Robert S. Mueller III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (Mar. 2019), https://perma.cc/42LF-

that both volumes of the report "minimize the identification of witnesses and co-conspirators, consistent with accepted Department practice," and he explained that he was providing "a redacted version of Volume Two that identifies certain information that remains under seal or is restricted from public disclosure by Federal Rule of Criminal Procedure 6(e)."[8] He also wrote, "[b]ecause Volume Two discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume Two should not be publicly released while their case remains pending."[9]

### D. The January 21 Injunction

On January 6 and 7, 2025, Nauta and De Oliveira filed Emergency Motions in the district court and in this Court seeking to enjoin the release of both volumes of the final report on the grounds that the report's release would prejudice their fair trial rights. A186. On January 7, to preserve the status quo pending a ruling by this

---

NLXC; Special Counsel Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024), https://perma.cc/Q6QS-HPSG; Special Counsel John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* (May 12, 2023), https://perma.cc/2WW9-6WDD; Special Counsel David C. Weiss, *Report on the Investigation Into the Criminal Conduct of Robert Hunter Biden* (Jan. 10, 2025), https://perma.cc/8LHM-9P2N.

[8] *Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7.

[9] *Id.*

Court on the Emergency Motion before it, the district court granted a temporary injunction barring DOJ from releasing the final report to anyone outside DOJ. A187–188.

In a letter to the Chairmen and Ranking Members of the House and Senate Judiciary Committees the following day, the Attorney General stated that when permitted to do so by the court, he would provide Volume II to the members *in camera* upon their "agreement not to publicly release any information from that review."[10] He also stated that "to avoid any risk of prejudice" to defendants Nauta and De Oliveira, Volume II "should not be made public so long as those defendants' criminal proceedings are ongoing."[11]

On January 13, 2025, after receiving assurances from the government that Volume I of the report concerned only the Election Interference Case, the district court denied Nauta and De Oliveira's Emergency Motion as to Volume I. A190. Attorney General Garland publicly released Volume I the following day.[12] The court

---

[10] *Letter from Attorney General Merrick Garland to Chairman Charles Grassley, Chairman Jim Jordan, Ranking Member Dick Durbin, and Ranking Member Jamie Raskin* (Jan. 8, 2025), https://perma.cc/QKT8-PRRC.

[11] *Id.*

[12] Alan Feuer, *Four Takeaways From the Special Counsel's Report on the Trump Election Case*, N.Y. Times (Jan. 14, 2025), https://perma.cc/PT99-YFZL; *see also* Special Counsel Jack Smith, *Final Report on the Special Counsel's Investigations and Prosecutions–Volume One: The Election Case–Report on Efforts to Interfere With the Lawful Transfer of Power Following the 2020 Presidential Election or the*

reserved ruling on the Emergency Motion, as narrowed to concern only Volume II, pending full briefing and an expedited hearing. A190–91. On January 15, 2025, to "facilitate" its resolution of the Emergency Motion, the district court ordered DOJ to "hand deliver a copy of Volume II to the Court to be reviewed in camera." A070 (Dkt. entry 705).

On January 16, DOJ filed a notice confirming that it had "provided to the Court for in camera review two hard copies of Volume Two: (1) an unredacted copy . . . ; and (2) a redacted copy representing what the Attorney General would make available to the Chairmen and Ranking Members of the House and Senate Judiciary Committees absent an order from the Court foreclosing those procedures." A194–95. DOJ stated that "[t]he redacted copy protects the secrecy of matters occurring before the grand jury, subject to Federal Rule of Criminal Procedure 6(e), as well as information sealed by court order." A195. DOJ also confirmed that "[n]either the redacted nor unredacted copies of Volume Two contain any classified information." *Id.*

The expedited hearing on the Emergency Motion was held on January 17, and the court and the parties' designated counsel "discuss[ed] specified contents of Volume II" during a closed session. A198, A200. On January 21, 2025, "following

---

*Certification of the Electoral College Vote Held on January 6, 2021* (Jan. 7, 2025), https://perma.cc/8SWU-PKL7.

the hearing and the court's review of all relevant filings, including an *in camera* review of Volume II itself," the district court issued the January 21 Injunction, which prohibits DOJ from releasing Volume II to anyone outside the Department out of concern for the fair trial and due process rights of Nauta and De Oliveira. A198, A209. The injunction was to remain in place "pending further Court order." A209.

In justifying the injunction, the district court invoked the "supervisory powers" of the federal courts "'to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials.'" A203 (quoting *United States v. DiBernardo*, 775 F.2d 1470, 1475–76 (11th Cir. 1985)). The court asserted, without citing authority, that "the traditional factors pertinent to a civil injunction" did not apply. A203–04, A208. Nevertheless, the court found that whether measured against the civil injunction factors or treated as an exercise of supervisory power, "the balancing of harms and interests" clearly favored an injunction "in the present posture." A208–09.

### E. The dismissal of the case against Nauta and De Oliveira

After President Trump was sworn in as the forty-seventh President of the United States, DOJ moved this Court to dismiss the appeal as to Nauta and De Oliveira with prejudice. A310. The Court granted the motion on February 11, 2025, bringing the criminal case to an end. A319.

### F. The Knight Institute's FOIA request

On January 26, 2025, the Knight Institute submitted a FOIA request to DOJ seeking a copy of Volume II of the Special Counsel's report. A235. DOJ denied the request on February 6, 2025, stating that Volume II "is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida." A247. DOJ also stated that because the criminal case against Nauta and De Oliveira was ongoing, the Department was withholding Volume II pursuant to Exemption 7(A) of FOIA, which "pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings." *Id.* After this Court dismissed the criminal case against Nauta and De Oliveira on February 11, 2025, A319, DOJ denied the Knight Institute's administrative appeal based solely on the January 21 Injunction.[13]

---

[13] *DOJ's Response to Knight Institute's Administrative Appeal* (June 20, 2025), https://perma.cc/27MM-2CZG. DOJ similarly cited the January 21 Injunction as its reason for refusing to disclose Volume II in response to FOIA requests filed by The New York Times and American Oversight. When the two organizations sued to enforce their requests, the district courts presiding over those cases concurred with DOJ that the January 21 Injunction precluded the lawsuits from proceeding. *See N.Y. Times Co. v. U.S. Dep't of Justice*, 25-cv-562, 2025 WL 2549435, at *5 (S.D.N.Y. Sept. 4, 2025) (granting DOJ's motion to dismiss); *American Oversight v. U.S. Dep't of Justice*, 779 F. Supp. 3d 40, 43 (S.D.N.Y. April 2025) (granting DOJ's motion for summary judgment).

### G. The Knight Institute's motion to intervene

On February 24, 2025, the Knight Institute filed a Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report. A072 (Dkt. entry 721), A211. Nauta and De Oliveira filed an opposition on March 14. A073 (Dkt. entry 739). On the same day, the United States, Nauta, and De Oliveira submitted a joint status report to inform the district court of their positions regarding the January 21 Injunction and the release of Volume II. *Id.* (Dkt. entry 740), A250. The parties wrote:

> The United States does not object to the Court keeping its order enjoining the Attorney General of the United States and the Department of Justice from releasing Volume II outside [DOJ], or sharing any information contained in Volume II with anyone outside the [DOJ], in place. The United States understands and appreciates the arguments made by Waltine Nauta and Carlos De Oliveira regarding the prejudice they would suffer if Volume II were to be released.

> The United States, Waltine Nauta, and Carlos De Oliveira also agree that under no circumstances should the Court order the release of Volume II of Jack Smith's confidential Final Report.

A250. In the same document, the government informed the court that it "does not intend to revive the charges brought by Special Counsel Smith." A251.

The government filed an opposition to the Knight Institute's motion to intervene on March 24, 2025, A073 (Dkt. entry 740) and the Knight Institute filed a reply brief on March 31. A073 (Dkt. entry 746). On July 7, pursuant to the local rules, the Knight Institute notified the district court that 90 days had expired since

the Institute's motion to intervene was fully briefed. A074 (Dkt. entry 750). The fully-briefed motion remains pending in the district court.

## IV.  The Reasons Why the Writ Should Issue

### A.  Legal standard governing issuance of the writ

While mandamus is an "extraordinary remedy," the Supreme Court has made clear that issuance of the writ may be appropriate "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943); *see also Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004); *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1265 (11th Cir. 2021). The writ may therefore issue when a district court "refus[es] to adjudicate issues properly presented to it." *Roche*, 319 U.S. at 27; *see also Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662–63 (1978). This Court and other courts of appeals have recognized that a writ may issue if a district court "simply delays too long in deciding a pending case," because "undue delay is tantamount to failure to exercise jurisdiction." 16 Wright & Miller, Federal Practice & Procedure § 3933.1 (3d ed.) (collecting cases); *see also In re Bennett*, 136 F.3d 1279, 1281 (11th Cir. 1998); *In re Daker*, 685 F. App'x 790 (11th Cir. 2017).[14]

---

[14] The *In re Bennett* opinion was later vacated as moot because it turned out that the district court had ruled on the habeas petition five days before this Court issued its opinion. *In re Bennett*, 136 F.3d 1281 (table) (11th Cir. Apr 15, 1998).

For the writ to issue, the petitioner must satisfy three conditions. First, the petitioner "must have no other adequate means to attain the relief [the petitioner] desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81 (cleaned up). Second, the petitioner's "right to issuance of the writ [must be] clear and indisputable." *Id.* at 381 (cleaned up). Third, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

Issuance of the writ is appropriate here.

### B.    All three requisites for issuance of the writ are satisfied here.

### 1.    The Knight Institute has no other adequate means to obtain relief because an interlocutory appeal is not available.

The Institute's motion to intervene has been fully briefed since March 31, 2025. The Institute notified the district court on July 7 that 90 days had passed since the motion became fully briefed. A258. Now the motion has been pending for six months. Mandamus is the only mechanism available to the Institute to compel the district court to adjudicate the motion to intervene, and the only mechanism available to the Institute to protect the rights the motion asserts. Importantly, the motion asserts a constitutional and common law right of *timely* access to a judicial record, a right that will be rendered hollow without a prompt adjudication of the Institute's

claims.[15] The district court's failure to address the Institute's challenge to the January 21 Injunction also effectively forecloses the Institute from pursuing its independent *statutory* right of timely access to government records under FOIA. At this point, this petition for a writ of mandamus is the Institute's only means of obtaining relief.[16]

### 2. The Knight Institute's entitlement to the writ is clear and indisputable.

The Knight Institute has a clear and indisputable right to a prompt decision on its motion to intervene because the six-month delay is manifestly unreasonable under the circumstances presented. Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C. J., for the Court); *see also New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1241 (11th Cir. 2024)

---

[15] In a variety of contexts, courts of appeals have recognized that mandamus is appropriate—and the only mechanism for meaningful relief—"to prevent the harm to First Amendment rights that would occur if review of the district court's decision had to wait until a final judgment." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1286 (3d Cir. 1994) (Alito, J.) (collecting cases); *In re A.H.*, 999 F.3d 98, 106 (2d Cir. 2021).

[16] The Institute has standing to assert the substantive rights asserted in the motion. This Court has recognized that nonparties have standing to intervene in criminal cases to assert First Amendment and common law rights of access to judicial proceedings and records. *See United States v. Valenti*, 987 F.2d 708, 711–12 (11th Cir. 1993). Nonparties also have standing to intervene when other constitutional or federal rights, such as FOIA rights, "are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004) (collecting cases).

(same). And "undue delay" in deciding a matter properly before a court is "tantamount to a failure to exercise jurisdiction." *Madden v. Myers*, 102 F.3d 74, 79 (3d Cir. 1996). Whether a particular delay is undue turns in part on the "severity and extent" of the harm caused by the delay, and whether the delay has the potential to compromise constitutional rights is a key consideration in assessing the severity and extent of the harm. *See In re A.H.*, 999 F.3d at 106 (cleaned up) (quoting *In re Halkin*, 598 F.2d 176, 198 (D.C. Cir. 1979), *abrogated on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)); *see also In re Daker*, 685 F. App'x at 790–91 (holding that magistrate's eight-month delay in conducting evidentiary hearing warranted mandamus relief because the petitioner was suffering ongoing punishments for exercising his freedom of religion).

Whether or not a six-month delay would be "undue" in another context, it is manifestly so here. The effect of the district court's inaction is to deny the Institute the constitutional and common law right its motion seeks to vindicate—the right of *timely* access to judicial records. As multiple courts have noted, the right of access is rendered illusory when district courts do not adjudicate access claims promptly. The right of access necessitates the timely adjudication of access claims.

The First Amendment guarantees a right of *contemporaneous* access because "the public benefits attendant with open proceedings are compromised by delayed disclosure of documents." *Doe v. Pub. Citizen*, 749 F.3d 246, 272 (4th Cir. 2014)

(emphasis added); *see also Lugosch v. Pyramid Co.*, 435 F.3d 110, 126 (2d Cir. 2006) ("Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found."). Access must be "immediate and contemporaneous" to fulfill the values that animate the access right—promoting community respect for the rule of law, providing a check on the activities of judges and litigants, and fostering more accurate fact finding. *In re Associated Press*, 162 F.3d 503, 506–07 (7th Cir. 1998) (quoting *Grove Fresh Distribs. Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)); *see also Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020).

Crucially, the right of timely access to judicial documents necessarily encompasses a right to timely adjudication of access claims. The Second Circuit addressed this issue at length in *Lugosch*. In that case, newspapers sought to intervene in a civil case to seek access to documents that had been filed under seal in connection with a summary judgment motion. 435 F.3d at 112. A magistrate judge left the newspapers' motion to intervene unaddressed for several months and then ruled that the motion should be held in abeyance until the district court resolved the summary judgment motion. *Id.* at 113. When the district court upheld the magistrate judge's decision to hold the newspapers' intervention motion in abeyance, the newspapers appealed. *Id.* The Second Circuit held that the appeal was proper under

the collateral order doctrine because requiring the newspapers to await resolution of the summary judgment motion "would effectively deny appellants much of the relief they seek, namely, *prompt* public disclosure of the motion papers." *Id*. at 118 (internal quotation marks omitted); *see also id*. (observing that the district court's delay in resolving the motion for access "did conclusively resolve a disputed issue— whether the Newspapers had a right of *immediate* access to the contested documents").

Reaching the merits, the Second Circuit emphasized that the district court had erred not only in failing to make on-the-record findings justifying the sealing of the material sought by the newspapers but in "failing to act expeditiously" on their motion for access. *Id*. at 126. The court wrote:

> We take this opportunity to emphasize that the district court must make its findings quickly. Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found. . . . The public cannot properly monitor the work of the courts with long delays in adjudication based on secret documents.

*Id*. at 126–27.

The Seventh Circuit made essentially the same observations in *Doe v. Public Citizen*, similarly faulting the district court for failing to resolve an access motion expeditiously. 749 F.3d at 272. "The public's interest in monitoring the work of the courts is subverted when a court delays making a determination on a sealing request

while allowing litigation to proceed to judgment in secret." *Id*. The Seventh Circuit

continued:

> Because the public benefits attendant with open proceedings are
> compromised by delayed disclosure of documents, we take this
> opportunity to underscore the caution of our precedent and emphasize
> that the public and press generally have a contemporaneous right of
> access to court documents and proceedings when the right applies.
> "Each passing day may constitute a separate and cognizable
> infringement of the First Amendment." *Grove Fresh Distribs., Inc. v.
> Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir. 1994) (brackets
> omitted) (quoting *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 []
> (Blackmun, Circuit Justice, 1975)). A district court therefore must
> make on-the-record findings . . . and act on a sealing request as
> expeditiously as possible.

*Id.* at 272–73. Other courts have also said that prompt adjudication of access motions

is necessary to give effect to the right of contemporaneous access to judicial

documents. *See Rothman v. Snyder*, Civil No. 20-3290 PJM, 2020 WL 7395488, at

*1 (D. Md. Dec. 17, 2020); *Lohnn v. Int'l Bus. Mach. Corp.*, No. 21-CV-6379 (LJL),

2022 WL 36420, at *7 (S.D.N.Y. Jan. 4, 2022).

Here, the district court's inaction—and, more specifically, its failure to

resolve the Institute's challenge to the maintenance of the January 21 Injunction—

also compromises the Institute's *statutory* right to timely access of government

records. FOIA was intended to promote an informed public by assuring prompt

access to government records, subject to narrow exceptions. *See* 5 U.S.C. §

552(a)(6). The statute requires agencies to respond to FOIA requests within specific

time frames. *Id.* It also requires them to promulgate regulations providing for

"expedited processing" of FOIA requests "in cases in which the person requesting the records demonstrates a compelling need," 5 U.S.C. § 552(a)(6)(E), and the Justice Department's regulations provide that the agency will process requests more expeditiously where they concern matters of "widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence," 28 C.F.R. § 16.5(e). The district court's delay in adjudicating the Institute's intervention motion thus compromises the Institute's statutory rights. In effect, the delay is a denial of the Institute's statutory right of timely access to a government record.[17]

3.  **Issuance of the writ is appropriate under the circumstances.**

    a.  **The district court's delay is manifestly unreasonable because it has compromised important interests raised in the intervention motion.**

Issuance of the writ is appropriate under the circumstances presented because the Institute's intervention motion has been pending for six months even though it implicates statutory, common law, and constitutional interests that the courts have repeatedly recognized are compromised by delay. *See supra* Part IV.B.2.

---

[17] DOJ denied the Institute's request for expedited processing, but the Institute intends to sue over the denial when the January 21 Injunction is lifted. A244–45.

### b. The strength of the substantive claims made in the motion underscores the need for the writ.

This Court need not resolve the right of access claim and the challenge to the January 21 Injunction that the Institute raises in the motion; it can leave these claims to the district court to resolve in the first instance. The strength of these claims, however, only reinforces the Institute's right to a prompt ruling on the motion to intervene.

### i. The Knight Institute has a First Amendment right of access to Volume II.

The Supreme Court has recognized a qualified First Amendment right of access to criminal trials and pretrial proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982); *Press-Enterprise Co. v. Superior Ct. of Cal.* (*Press-Enterprise I*), 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Ct. of Cal.* (*Press-Enterprise II*), 478 U.S. 1 (1986). Underlying the First Amendment right of access is "the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," so that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

Against the background of these cases, this Court and others have recognized a qualified First Amendment right of access to the full range of criminal proceedings,

and to court documents submitted in connection with those proceedings. *See, e.g.,*
*Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200, 1208 (9th Cir. 2024)
("As both we and the Supreme Court have recognized, the First Amendment grants
the public a presumptive right to access nearly every stage of post-indictment
criminal proceedings, including pretrial proceedings, preliminary hearings, voir dire,
trials, and post-conviction proceedings, as well as records filed in those criminal
proceedings" (collecting cases)); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168,
176 (5th Cir. 2011) (collecting cases); *Newman v. Graddick*, 696 F.2d 796, 800–02
(11th Cir. 1983); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028–31 (11th
Cir. 2005).[18]

Once the qualified First Amendment right of access attaches, a proceeding
may be closed or a document sealed only when the party seeking closure
demonstrates that it is "necessitated by a compelling governmental interest, and is
narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 607. The
district court must consider whether reasonable alternatives to closure would
adequately protect the compelling interest at issue, and it must make specific on-the-

---

[18] Grand jury proceedings are the exception, *In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559, 1561–63 (11th Cir. 1989), but that exception is not relevant here because the Knight Institute is not seeking the release of information properly protected by Federal Rule of Criminal Procedure 6(e).

record findings justifying closure. *See Press-Enterprise II*, 478 U.S. at 13*; Ochoa-Vasquez*, 428 F.3d at 1030.

Under these precedents, the presumptive right of access attached to the district court's January 17, 2025 hearing on Nauta and De Oliveira's Emergency Motion, and to Volume II, which was the subject of the hearing and which was submitted to the court in connection with the hearing. Petitioner assumes that the presumptive right of access was overcome at the time of the hearing by the countervailing interest in protecting Nauta and De Oliveira's fair trial rights. But the public interest in the disclosure of the report became weightier when then-former President Trump was re-elected—and, even more importantly, the fair-trial interests that once overcame the First Amendment right of access evaporated when this Court dismissed the criminal case against Nauta and De Oliveira on February 11, 2025.

At this point there is no significant likelihood that Nauta and De Oliveira will face trial. Again, this Court dismissed the case against them on February 11, 2025, on DOJ's motion, and DOJ subsequently represented to the district court that it does not intend to revive the charges against them. If there is any risk at all that Nauta and De Oliveira will face trial, the risk is remote at best. Nor is there any significant risk that the release of Volume II will compromise their legitimate interests in other ways. It is unlikely that the release of Volume II will cause significant injury to Nauta or De Oliveira's reputation or public standing beyond the injury that has

already resulted from the publicly filed superseding indictment, which accused them of a profound betrayal of public trust and included copious information to justify the accusation. Nauta and De Oliveira stated in the March 14, 2025 Joint Status Report that they received "approximately a year-and-a-half of rampant pretrial publicity" after they were indicted. A253.[19]

And with then-former President Trump now returned to the Oval Office, the public interest in the disclosure of Volume II could hardly be greater. The disclosure of the report would shed light on the character and actions of the nation's highest-ranking official. It would also inform the public about one of the most significant criminal investigations in American history; about the scope and integrity of the Special Counsel's investigation; and about the Justice Department's understanding of the Espionage Act, a statute that has broad implications for free speech and press freedom.[20] In other words, public access would facilitate the "free discussion of governmental affairs" and enhance the public's ability to "participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

---

[19] Again, the Institute seeks the copy of Volume II in the district court's files that has been redacted to "protect[] the secrecy of matters occurring before the grand jury, subject to Federal Rule of Criminal Procedure 6(e), as well as information sealed by court order." A195.

[20] *See generally* Sam Lebovic, *State of Silence: The Espionage Act and the Rise of America's Secrecy Regime* (Basic Books, 2023).

In these circumstances, any concerns about fair trial rights or private injury are vastly outweighed by the public interest in disclosure.

>        ii.     **The Knight Institute also has a common law right of access to Volume II.**

Volume II is also subject to a presumptive right of access under the common law. The common law guarantees the public's right of access to judicial proceedings, which includes the right to "inspect and copy . . . judicial records." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). As this Court has recognized, such access is "crucial to our tradition and history, as well as to continued public confidence in our system of justice." *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1358–59 (11th Cir. 2021). "The operations of the courts and the judicial conduct of judges are matters of utmost public concern, and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (cleaned up).

A document is a "judicial record" subject to the common law right of access if it is submitted to the court in connection with a motion that "invoke[s] [the court's] powers or affect[s] its decisions, whether or not [the motion is] characterized as dispositive." *Id.* at 1246. A document need not be filed on the court's docket to become a judicial record. *See In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001).

Submission of a document *in camera* may be sufficient. *Comm'r, Ala. Dep't of Corr. v. Advance Local Media LLC*, 918 F.3d 1161, 1167–68 (11th Cir. 2019).

Where the presumptive common law right of access attaches, it can be overcome only by "a showing of good cause, which requires balancing . . . the public interest in accessing court documents against a party's interest in keeping the information confidential." *Romero*, 480 F.3d at 1246. To assess whether good cause exists, "courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Id.* Courts also consider "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *Newman*, 696 F.2d at 803.

Volume II is a judicial record subject to the presumptive common law right of access because it was submitted to the district court in connection with a motion that invoked the court's powers. Here, the district court directed the government to deliver a copy of Volume II to the court for *in camera* review in order to "facilitate"

the court's consideration of Nauta and De Oliveira's Emergency Motion. A070 (Dkt. entry 705). In addition, the court expressly relied on Volume II in deciding the Emergency Motion. The court discussed "specified contents of Volume II with designated counsel" during a closed portion of the hearing on the motion, and stated that its *in camera* review of Volume II was integral to deciding the motion. A198, A200–01.

Petitioner assumes that the presumptive common law right of access to Volume II was overcome while the criminal case against Nauta and De Oliveira was pending. However, since this Court dismissed the criminal case, all of the factors that courts usually consider in this context have weighed in favor of Volume II's release. Again, Volume II concerns a public official of the highest rank—the current and former president. It addresses a matter of singular public concern—the investigation and prosecution of a former president for the alleged willful retention of military secrets in violation of the Espionage Act. The risk that the release of the document will prejudice any legitimate interest of Nauta and De Oliveira is negligible. At this point, any concern about their fair trial rights or privacy interests is greatly outweighed by the public interest in disclosure.

iii. **The district court lacks any valid basis for maintaining the January 21 Injunction.**

The Knight Institute's argument that there is no longer any legitimate basis for the January 21 Injunction is also meritorious. As an initial matter, it is doubtful

that the district court had jurisdiction to issue the January 21 Injunction in the first place, because the court issued the injunction after it had dismissed the case and after DOJ had lodged an appeal. It is a "longstanding tenet of American procedure" that the filing of a notice of appeal confers jurisdiction on the court of appeals and "divests the district court of its control over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)). When, as here, "an appeal is taken from a judgment which determines the entire action, the district court loses power to take any further action in the proceeding, except to act in aid of the appeal or correct clerical errors." *Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298, 299 (5th Cir. 1984).

Even if the district court had jurisdiction to issue the January 21 Injunction, however, the injunction lost its justification after February 11, 2025, when the criminal case came to an end. As noted above, the district court predicated its issuance of the injunction on its "supervisory powers" in a criminal case and rejected as inapplicable "the traditional factors pertinent to a civil injunction." A208–09. Nevertheless, the court found that whether measured against the civil injunction factors or treated as an exercise of supervisory power, "the balancing of harms and interests" clearly favored an injunction "in the present posture." *Id.* The court noted that DOJ had not "sought leave to dismiss the appeal" and that it had not ruled out

"proceed[ing] on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings." A204, A207. Four days later, however, the government moved to dismiss the appeal with prejudice, and this Court granted the government's motion on Feb. 11. A317, A320. On March 14, moreover, DOJ represented to the district court that it did not "intend to revive the charges." A251.

Given the change in circumstances, there is no valid basis to maintain the injunction under the court's supervisory power or as a court of equity. The district court properly noted that federal courts may exercise their supervisory power "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury." *United States v. Hasting*, 461 U.S. 499, 505 (1983). But even if one assumes that the injunction was once necessary to protect the integrity of the trial, there is no longer any trial to protect, and DOJ has ruled out any possibility of a future trial. *Cf. N.Y. Times*, 2025 WL 2549435 at *7 n.3 (finding these to be "compelling arguments" that Nauta and De Oliveira's "fair trial rights, which the Permanent Injunction aimed to protect, are no longer at risk").

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romer-Barcelo*, 456 U.S. 305, 312 (1982); *see also Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief." *Amoco*, 480 U.S. at 542. The Supreme Court has also emphasized that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312. As explained above, the balance here overwhelmingly favors disclosure.[21]

> ### c. The Petition raises "special circumstances" that further reinforce the need for the writ.

The Knight Institute's Petition also raises "special circumstances" that further justify issuance of the writ. *Roche*, 319 U.S. at 31. As the Institute explained below (and in its FOIA request attached as an exhibit to the motion to intervene), the Special Counsel's report concerns allegations of grave criminal conduct by the nation's highest official. The report's release would shed light on the scope and integrity of the Special Counsel's investigation and on the character and actions of the then-former and now-current President. *Cf. In re North*, 16 F.3d 1234, 1241 (D.C. Cir. 1994) (concluding with respect to the final report of the Independent Counsel for the Iran-Contra Affair that it "is in the national interest that the public,

---

[21] Lifting the injunction would not necessarily result in the release of the entirety of Volume II through FOIA. If DOJ believes that some of the report should be withheld on the grounds that it is Rule 6(e) material, it will presumably seek to withhold that information from disclosure through FOIA's Exemption 3. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007) (holding that Rule 6(e) "counts as a statute for purposes of Exemption 3").

its representatives in the political branches, and its surrogates in the media have as full an access to the fruits of the investigation as possible"). The disclosure of the report would also inform the public about the Justice Department's understanding of the Espionage Act, a statute with broad implications for free speech and press freedom.

The Supreme Court has emphasized that the First Amendment was meant to protect the right of the public to freely examine "public characters and measures," *N.Y. Times v. Sullivan*, 376 U.S. 254, 274 (1964) (quoting Virginia Resolutions of 1798), and FOIA reflects the same goal, *U.S. Dep't of Def. v. Fed. Labor Rel. Auth.*, 510 U.S. 487, 497 (1994). The district court's inaction here compromises the interests that the First Amendment and FOIA were intended to protect.

## Conclusion

For all of these reasons, the Court should issue a writ of mandamus requiring the district court to fully resolve the motion to intervene—including the substantive claims raised therein—without further delay.

Sept. 30, 2025

David Buckner
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables, FL 33134
(305) 964-8003

Respectfully submitted,

 /s/ Scott Wilkens
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115

(646) 745-8500
scott.wilkens@knightcolumbia.org

*Counsel for Petitioner*

## Certificate of Compliance

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 7,694 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: Sept. 30, 2025

*/s/ Scott Wilkens*
Scott Wilkens